J. C. Hilton and Vera Hilton v. Commissioner.
Hilton v. Commissioner
Docket No. 150-68.
United States Tax Court
T.C. Memo 1971-102; 1971 Tax Ct. Memo LEXIS 229; 30 T.C.M. (CCH) 444; T.C.M. (RIA) 71102; May 13, 1971, Filed Wentworth T. Durant, 3434 First Nat'l Bank Bldg., Dallas, Tex., and Frederick P. Durant, for the petitioners. David E. Gaston, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined a deficiency of $14,924.65 in petitioners' income tax for the calendar year 1963. Due to concessions of the parties, the only issue remaining for our consideration is whether certain expenditures (for professional fees and travel) incurred by petitioners during 1963 were properly deductible under section 212. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners J.C. Hilton *230 and Vera Hilton are husband and wife and were residents of Lubbock, Tex., at the time their petition herein was filed. On July 16, 1964, petitioners filed their joint income tax return for the calendar year 1963 with the district director of internal revenue, Dallas, Tex. Because Vera Hilton is a party to this case only by virtue of having joined with her husband in filing their Federal income tax return for the year in issue, reference to the "petitioner" will hereinafter be limited to petitioner J. C. Hilton. During the years pertinent to this case, petitioner was in the transport and storage business and was employed by Dean Van Lines, Inc. (Dean L.A.), a corporation domiciled in Los Angeles, Calif. Prior to his association with that company, petitioner and one C.B. Boydston (Boydston) operated their own transfer and storage business in Lubbock, Tex., under the partnership name of B&H Transfer and Storage (B&H). [1] During this earlier period, B&H had authority to transport merchandise through 11 western states. None of these states were within the 35-state operating authority which had been granted to Dean L.A. As a result, merger proceedings were initiated, and sometime prior *231 to 1960, B&H was merged into Dean L.A. The terms of this merger account for petitioner's status as an employee and 24 1/2 percent shareholder of the surviving company. Beginning in 1959, Dean L.A. obligated itself to pay petitioner a salary of $1,000 per month - said amount to be adjusted against an override (or commission) of five percent which both petitioner and Boydston were to receive as a result of business secured through their agents. Petitioner and Boydston were also partners in an undertaking called the DBH Joint Venture (DBH), whose function it was to purchase trailers and lease them to Dean L.A. Petitioner was entitled to 25 percent of the net profits earned by DBH. Additionally, petitioner was a two-thirds shareholder of a third concern, the B&H Warehouse, Inc. (Warehouse), whose activities were closely tied in with those of Dean L.A. During the years which are pertinent to this proceeding, Warehouse booked freight for Dean L.A. on a commission (or override) basis. Commencing with the year 1961, the override payments which Dean L.A. was obligated to make to *232 petitioner and Warehouse, and the rent money which was due DBH, became very irregular. As the arrearages mounted, petitioner became increasingly concerned. Finally, during the latter part of 1961, he decided to travel to Dean L.A.'s California offices in the hope of collecting the money owed to him and to Warehouse. Between 1961 and 1963 petitioner made approximately 21 trips to California, all of which were, in some way, geared to an investigation of Dean L.A.'s financial affairs. At first petitioner traveled alone; however, as he encountered more and more obstacles, it became abundantly clear that professional assistance would be needed. Accordingly, in February 1962, petitioner hired Curtis Pryor, a certified public accountant whose offices were located in Lubbock, Tex., to assist petitioner in the examination of Dean L. A.'s activities. From this date until October 1963, Pryor accompanied petitioner on 12 trips to California, eight of which were made during 1963. It was hoped that "[these] trips * * * [would help] to determine the problems * * * confronting Dean Van Lines in order to collect monies owing petitioner." [2] Petitioner also retained the services of Donald Murchison, *233 an attorney with offices in Beverly Hills, Calif.
As a result of their trips to California, petitioner and Pryor were able to determine that Dean L.A. was in a very precarious 446 financial position. During their visits they conferred with banks which did business with Dean L.A., and spoke with several of Dean L.A.'s officers. The knowledge obtained from these conferences, coupled with critical information obtained from certain financial statements which had been prepared for Dean L.A., persuaded petitioner and Pryor that the company was insolvent. As a consequence of this discovery, petitioner, whose efforts had enable him to collect only some of the money owed to him by Dean L.A., threatened to initiate involuntary bankruptcy proceedings against that company. In the course of the negotiations which followed this threatened suit, Dean L.A.'s president offered to let petitioner take over the management of Dean L.A. Petitioner discussed the offer with a number of his associates and financial institutions he thought might have been interested in helping him raise *234 the necessary capital. However, after further discussion with Pryor and Carroll Cobb (Cobb), a Lubbock attorney whom petitioner hired in July 1963, petitioner decided to get out of the operation. This decision was reached on October 6, 1963. On October 7, 1963, Pryor and Cobb, acting on behalf of petitioner, negotiated a sale of petitioner's interest in Dean L.A. for the sum of $100,000. At no time prior to October 6, 1963, had petitioner considered selling his Dean L.A. stock. Of the $100,000 selling price, petitioner received $2,500 on October 7th and $47,500 on the closing date, October 24, 1963. The rest was paid in the form of nonnegotiable notes. Both Pryor and Cobb were present at the closing. On his Federal income tax return for the year 1963, petitioner treated the following amounts [3] as deductible expenses: Legal and accounting
$ 9,086.38
Travel Expense
3,988.41
Depreciation (on an automobile characterized as a "Business car.") 560.99
[4] $13,635.78 In respondent's notice of deficiency, the deduction of these expenditures was disallowed; however, as evidenced by the following explanation which accompanied respondent's deficiency determination, *235 these amounts were allowed as offsets against long-term capital gain: Explanation of Adjustments (a) It is determined that the amount of $13,635.78 claimed as a deduction for business expense represents expense in connection with the sale of Dean Entities instead of ordinary and necessary business expense. This amount of $13,635.78 is disallowed as business expense. However, it is allowed in computing the taxable portion of long-term capital gain in item (b) [sale of the Dean L.A. stock]. * * * Opinion Whether the expenditures in question were incurred (a) in connection with petitioner's attempts to collect money owed to him by Dean L.A. (in which event they would be deductible *236 under section 212(1), see (C.A. 5, 1963)), or (b) in connection with the sale of petitioner's Dean L.A. stock (in which event they would not be deductible under section 212(1), see (C.A. 8, 1970)), is quite clearly a question of fact the burden of which rests with petitioner. [5] In this case, that burden has been considerably lightened by several key acquiescences which appear in respondent's brief. [6] Specifically, respondent's brief contains little or no objection to the following requested findings of fact which appear in the brief filed by petitioner: Petitioner's Brief 13. Due to arrearages in payments to petitioner and to B & H Warehouse, the warehouse operation was badly in need of money. 14. To collect the arrearages, petitioner began to make trips to Dean headquarters and managed to collect some of the moneys owed him. 447 15. After a while petitioner felt that the efforts which he was expending were not very successful and in February 1962, he hired Curtis Pryor, a certified public accountant of Lubbock, Texas, to aid him in examining Dean Van Lines affairs in order *237 to collect moneys due him. 16. In order to further aid him in collecting money, petitioner hired Donald Murchison, an attorney of Beverly Hills, California. Later, in July 1963, he hired Carroll Cobb, an attorney of Lubbock, Texas. 17. Over a period of 18 to 20 months, from 1961 to 1963, petitioner made approximately 21 trips to California in twelve of which he was accompanied by Mr. Pryor. 18. These trips were made to determine the problems confronting Dean Van Lines in order to collect moneys owing petitioner. Respondent's Brief 13 to 17, inclusive. Respondent has no objection to paragraphs 13 to 17, inclusive. 18. Respondent objects to paragraph 18 and, in order to accurately reflect the testimony, requests the Court to find the following fact in lieu thereof: These trips were made to determine the problems to be confronting Dean Van Lines, in *238 order to collect monies owing petitioner. Petitioner's Brief 35. On October 6, 1963, petitioner again discussed taking over the Dean Van Lines operation with Pryor and Cobb. They advised him not to. 36. Petitioner then, for the first time, reached a decision to get out of the operation and to sell his stock if he could. 37. October 6, 1963, was the first time petitioner considered selling his stock. 38. Petitioner instructed Pryor and Cobb to get him out of the operation with the best offer they could get. 39. Following petitoner's instructions, on October 7, 1963, Mr. Pryor and Mr. Cobb began to negotiate on behalf of petitioner for the sale of his stock. 40. On that day they discussed the sale of petitioner's stock with representatives of Dean Van Lines. Petitioner was not present during these negotiations. Respondent's Brief 35 to 40, inclusive. Respondent has no objection to paragraphs 35 to 40, inclusive. As a result of the above parade of concessions, it would appear that respondent has conceded himself out of court at least to the extent of those expenditures which were incurred prior to October 6, 1963. (Compare paragraph 18 with paragraphs 37 and 39.) *239 We, too, believe that petitioner has established his position with respect to those expenditures which were incurred prior to October 6, 1963. However, since we also believe that some portion of the $9,086.38 paid to petitioner's attorneys and accountant must have been attributable to the services performed by these men in connection with the sale of petitioner's Dean L.A. stock, we think it would be error not to apportion some part of this amount to those events which occurred between October 6th and October 24th. Cf. , affd. (C.A. 9, 1955). Accordingly, since petitioner has provided us with no basis for such apportionment, we hold that 25 percent of the $9,086.38 was expended in connection with the sale of petitioner's stock, and that respondent acted properly in disallowing this amount as a deduction under section 212(1). Similarly, we believe that some portion of the $3,988.41 expended by petitioner for travel and lodging [7] should also be allocated to the post-October 6th activities of petitioner and his advisors. Utilizing the limited amount of information we have at our disposal, we think an appropriate *240 amount would be $500. Therefore, to this extent we uphold respondent's disallowance of the "Travel Expense" deduction taken by petitioner. To reflect the concessions of the parties, and to consider the effect of our holding on certain medical expense deductions taken by petitioner, Decision will be entered under Rule 50. 448 Footnotes
1. During the trial of this case, B&H was also referred to, by petitioner, as "Transaire Storage, Inc."↩
2. Quoted material appears in respondent's brief as paragraph 18 of respondent's requested findings of fact.↩
3. Of these amounts only the first two are still in contest. ↩
4. Although the above expenditures were characterized as business expenses on petitioner's return and on respondent's notice of deficiency, it is clear from the briefs filed by both parties that the question in this proceeding is whether such amounts were properly deductible under section 212, as expenses incurred for the collection of income. (All statutory references in this case are to the Internal Revenue Code of 1954, as amended.)↩
5. Even if we hold that the disputed expenditures were not incurred in connection with activities which come under the pale of section 212(1), such amounts will still be allowed as an offset against the amount received by petitioner on the sale of his interest in Dean L.A. ↩
6. Briefs in this case were filed seriatim.↩
7. Our study of the record leads us to the conclusion that the $3,988.41 deduction for "travel expense" was intended to cover both the cost of travel and lodging for petitioner and each of his advisors.↩